R. H. DACHNER, Doing Business Under the Firm Name and Style of PACIFIC MACHINERY & ENGINEERING COMPANY, Plaintiff AND Respondent, *v.* UNION LEAD MINING AND SMELTER COMPANY, a Nevada Corporation, Defendant and Appellant.

No. 3499

June 25, 1948.                    195 P.2d 208.

*William S. Boyle* of Reno, *W. E. Baldy*, of Carson City, and *Robert Emmet Berry*, of Virginia City, for Appellant.

*Morgan, Brown & Wells*, of Reno, for Respondent.

## OPINION

By the Court, BADT, J.:

R. H. Dachner, doing business under the name and style of Pacific Machinery & Engineering Company, obtained judgment in the district court for the sum of $25,462.07 against the defendant, Union Lead Mining and Smelter Company, a Nevada corporation, for damages growing out of the failure of the defendant to comply with the terms of an alleged contract under which the plaintiff was to construct a flotation mill for the defendant for the sum of $100,000. Defendant has appealed from the judgment and from the order denying its motion for a new trial. The judgment in the sum above mentioned included an item of $15,000 for lost profit, some $3,000 paid by the plaintiff for engineering services, $500 attorneys' fees paid for services in connection with incorporating a new company to accomplish the financing of the project, and items of payments for machinery, wages and sundry expenses, etc. The district court held as a matter of law that the parties had entered into the contract alleged by the plaintiff, and included in its judgment all items of damage claimed. If the lower court was correct in holding that a contract existed, we are then confronted with a number of questions including (1) as to whether there

was a breach of the contract by the defendant, (2) as to whether the plaintiff had first breached his contract, (3) as to whether such breach, if it existed, excused performance on the part of the defendant, (4) as to whether the plaintiff's alleged breach was in turn caused by the failure of the defendant to perform a condition precedent, (5) whether the items found by the trial court were proper elements of damage under the circumstances, (6) as to the court's findings of fact with reference to a number of items of damage holding that they were necessary expenditures of the plaintiff "in pursuance of the obligations placed upon him by said contract," whereas the complaint pleaded each of such items as a quantum meruit, (7) the sufficiency of the proof of these elements, and sundry incidental questions, including many exceptions growing out of the court's rulings on the admissibility of evidence. On the other hand, if we determine that the trial court was in error in finding that a contract had been entered into between the parties but that the plaintiff is nonetheless entitled to relief as to some of the items within the pleadings and the proofs, many of the questions enumerated will not require our attention at this time. Thus we turn to a consideration of the facts to determine the sole question of law first presented, namely, whether the trial court erred in finding that a contract existed between the parties.

Was there or was there not a contract between the plaintiff and the defendant for the construction of a mill by the plaintiff for the defendant for the lump sum of $100,000, which sum, plus an additional $50,000 for the retirement of indebtednesses of the defendant, was to be provided by the plaintiff and secured by the defendant's mortgage, but which was not to be paid to the defendant until the defendant had first submitted a certified public accountant's report showing the details of such aggregate indebtedness? Throughout the trial plaintiff steadfastly asserted that such a contract existed, that he had proceeded under it in good faith and was

ready, able and willing to perform, was prevented from doing so by defendant's failure to submit the promised audit, that this was the reason he had never advanced the $50,000 or the $100,000 to provide the cost of the mill and that the defendant had subsequently, without right, canceled his contract. Just as steadfastly the defendant maintained throughout the trial that there never was any contract between the parties, that the matter never got beyond the stage of negotiations, that the accountant's audit was never required as a prerequisite or condition precedent and that even under the tentative negotiations, claimed by the plaintiff to be a contract, plaintiff had entirely failed in his consideration by failing to advance the $100,000 or the $50,000 or any amount whatsoever. These divergent views were made manifest throughout the trial, were submitted to the district court at the conclusion of the case and in the matter of the making of findings and conclusions and on motion for new trial and were the main subject of contention as raised in the oral arguments before this court and the lengthy briefs on file. Coupled with this situation is the further angle of the dealings of the plaintiff with a group of third persons and the dealings of these third persons both with the plaintiff and the defendant—all with reference to the financing of the project by such group of third persons.

At the conclusion of the testimony and the submission of the case to the district court before which the case was tried without a jury, the learned district judge announced his decision from the bench in seventeen lines as follows:

"The testimony in this case leads the Court to the conclusion that there was a definite legal contract between the defendant and the plaintiff to do the things set out, that is: To build the mill and furnish the additional sum of $50,000 for the retirement of certificates and certain obligations; And the Court feels that it is reasonable to assume, *upon the various documents that have been*

*submitted,* that these were obligations requiring the cooperation of the company to assist Mr. Dachner in carrying out the terms *of the contract,* and that this cooperation that was made necessary by the terms *of the various communications* was not carried out by the company. It is therefore the judgment of the court *that there was a definite contract* between the company and Mr. Dachner, and that by reason of the violation of the contract, that Mr. Dachner has been damaged in the sum of $25,467.07 and that he have judgment therefor." (Emphasis supplied.)

There was no formal written contract between the parties, and none such is claimed. There were, however, sundry meetings of plaintiff with the officers of the defendant corporation and with the directors of the defendant corporation and with groups of stockholders of the defendant corporation held at San Francisco, at Carson City, at Reno, and at the mine. There were also meetings and conferences between the plaintiff and the third party group. There were also informal unsigned memoranda made by one or more of the parties as to what had transpired at some of the conferences and meetings. There was testimony of oral proposals and counter proposals and testimony seeking to establish one or more oral agreements between the parties. In addition, there was an exchange of a great deal of correspondence. So confusing was the record of all of these transactions running through the months of March, April, and May 1946 and so confusing were the conflicting interpretations of these transactions as contained in the briefs of counsel that, in an attempt to clarify and concentrate upon the time and place and circumstances under which the minds of the parties had met or were claimed to have met upon the contract, one of the justices at the oral argument asked counsel for the respondent at the close of the latter's argument:

"Q. Is it your contention that the contract was made on March 4th? A. Mr. Brown: It is.

"Q. And that that was a completed contract? A. Yes.

"Q. Then the respective parties knew what their rights and obligations were on March 4th? A. At the meeting in the office of Mr. Dachner on March 4th, Mr. Dachner understood what he was to do, and was ready to do it. Under our theory, the meeting of the directors and stockholders at Carson City on the 10th day of March, 1946, was predicated upon the meeting in San Francisco on March 4, 1946.

"Q. At this meeting various proposals and counter proposals and tentative plans were made, but your contention is the contract was made—A. March 4, 1946. And, may it please the Court, the correspondence bears that out. For example, there will be found in the record this letter referred to by Mr. Boyle, on the 8th of April, I believe it was, wherein he (Dachner) writes a long letter as to just what power lines he was to put in, reiterates as to the kind of mill, what the foundations were to be, etc. But prior to that time he had already obligated himself. We contend that the contract was actually made March 4, 1946, in the office of Mr. Dachner, in San Francisco, and was ratified by the letter, containing the resolution, of April 5, 1946, and this letter of April 8, 1946, and after March 4th, from that time on, both Dachner and the defendant corporation were firmly bound, and that the meeting on the 10th of March was merely complementary."

The plaintiff in his testimony also proceeds to identify the particular meetings, transactions, etc., upon which he relies as establishing the subsistence of his contract: "This matter of going to these various men, meaning Mr. Blackwood, Mr. Conner and others (these were the men who were financing the deal) was done on the strength of a contract with Union Lead Mining & Smelter Co. of April 5th, and later augmented on April 17th." Later he testified that all matters were to be finally ratified "when the Union Lead Co. had complied with the tenets of their agreement as of March 8th

(March 10)." Still later he testified that he was relying upon a letter of April 17th from the defendant to him. Later he referred to the necessity of the compliance by the defendant "with the conditions that had been agreed upon as of March 10th—the contract that was originally made—the one which I have always based my whole work and plans—the one adopted by the Board of Directors on March 10th." Later he testified that he relied upon the "gentlemen's agreement" of March 4 with Somers, Blackwood, Thorwaldson, Conner and Peterson, that later "had to be verified and authorized and sanctioned by the Board of Directors at Carson as of March 10th." Later he testified: "I relied upon the orders given to me by the gentlemen March 4th * * * ratification March 10th * * * correspondence * * * contract of April 5th and letter of April 7th * * * directors' meeting of March 10th." By the April 7 letter he probably meant the April 17 letter before mentioned. He also testified: "I had a contract from them to build a mill * * * I am depending upon, first, verbal agreement and contracts that I call from man to man, between Mr. Somers and his directors, to tell me to prepare plans and specifications for building a mill. Later on, the written contract which, for all intents and purposes, was specifically intended to draw up a contract in order to facilitate building the mill." He then indentifies the written contract to which he referred as the letter of April 5th hereinafter set forth in full. He then testifies:

"Q. And you took that to be an authorization to you? A. Yes Sir.

"Q. That is what you took as an authorization to you? A. Yes sir, a contract."

Even making allowance for the confusion and errors in the recital of the actual dates of the respective meetings, letters and other instruments, and for the error into which a layman might readily fall in characterizing some particular conference or some particular instrument as an agreement or a contract, it is still evident

that much confusion exists and that a careful scrutiny and analysis of the record must be made to determine at what point, if at all, the minds of the parties met. This involves a consideration of the various meetings, conferences, proposals, writings, corporate meetings, correspondence, etc. Although the complaint alleges that the contract was entered into on about January 1, 1946, neither plaintiff nor his attorney predicates the former's claim on anything that transpired prior to March 4, 1946, and the court's findings, prepared by respondent, fix that date as the date of the contract.

On February 28, 1946 Somers had written to Dachner "* * *˙ so let me know at once what it will cost for a flotation mill, say 75 to 100 tons * * *." Dachner replied on March 2, 1946 that he had seen Thorwaldson and Peterson and that they "were calling a meeting with Blackwood Monday" (that would be March 2, 1946) "at which time they will no doubt · come to some final decisions as to how to proceed on this deal * * * I am getting my figures together. I *have* a 4 x 9 rod mill and a 6x5 ball mill, either of which will give you about 100 to 150 tons *˛ * * I am going ahead *to work up prices and delivery* *˙ * *."  On March 4, 1946, according to the testimony of Dachner, there was a meeting at his office at San Francisco attended by himself, Somers, Peterson, Blackwood and Thorwaldson. Somers was the president of the defendant corporation. Although Blackwood was a director, there is nothing to indicate that he attended in such capacity. In fact it appears throughout the testimony that he, Peterson and Thorwaldson were part of the group who contemplated financial investment in the project. At that meeting Dachner explained the three methods for constructing a mill, namely, (1) where the corporation makes its own plans and then goes out into the open market to buy the machinery and build the mill; (2) where it hires someone to build the mill on a cost plus basis; and (3) a "turn-key" job, under which the contractor agrees to

build the mill for an agreed fixed sum.[1]  He then testi-
fied: "After lengthy discussions each one had their view
expressed, their views, rather—and it was then and
there decided that they would prefer a turn-key job, and
I was asked by all parties present to proceed on that
basis, including Mr. Somers and Mr. Blackwood.  In fact
may I add that Mr. Somers was one of the greatest pro-
ponents of a turn-key job because he maintained at that
time that they were beset with so many other problems
that had to be done, underground, or the reorganiza-
tional problems, and that he, himself, and others, were
beset with many other duties; that they wanted me to
take the responsibility for building the mill."

"Q. And did you, thereafter—that is after March 4,
1946, proceed, then, to prepare your *plans, specifications*
and *estimates?*  A. I did.  I had already—but I kept on,
then, in earnest, of course.  I was invited to the meeting
at Carson City, too, at that meeting  *  *  *.  It was
decided then in order to facilitate matters and bring the
whole project before the Board of Directors and the
stockholders that a meeting should be called at the corpo-
ration's office in Carson City to ratify all of the agree-
ments, verbal agreements, that had been made between
Mr. Thorwaldson and Mr. Somers and myself.  It was
generally concluded that I had gone so far with this
preparatory work that something official should come
out of the corporation's directorate to make it authentic
and with that view a meeting was called on the 4th—no,
on the 8th of March."  (The meeting was actually held
March 10.)

On cross examination when asked when he first found
out that he had a turn-key job, he testified: "March 4th
was the time when the people that were responsible in
this matter and that were later present at the March 8th

---

[1]The 1948 edition of Webster's International Dictionary gives the
following definition: "Turn-key job.  Any job or contract in which
the contractor agrees to complete the work to a certain specified
point and to assume all risk."

(10th) meeting at Carson City, told me that that should be done." Later, on cross examination, Dachner asked permission to make an explanation and, receiving such permission from the court, he testified at some length that between the time of the resolutions of the Board of Directors of March 8th (10th) concerning the change in the name of the corporation and the new proposed corporate setup and the meeting of April 15th Mr. Somers had complained that the progress was too slow and that on April 5th Dachner, Thorwaldson and Conners proposed to raise the $150,000 for the purposes theretofore indicated, proceed to build the mill and let the corporate reorganization proceed in the meantime, and that Somers then said, according to Dachner: "Let us give you a contract, meaning me (Dachner), and then these men can give you the money to build the mill and the $50,000, and in order to secure that money we will give you a first mortgage on our property." We interject this statement made by Dachner at this point under our discussion of the March 4 meeting, for the statement ascribed by him to Somers, "Let us give you a contract (to build the mill and advance $50,000 to retire indebtedness)" would seem to be at variance with his direct testimony that such a contract had been made on March 4th, or confirmed on March 10.

The plaintiff also called Blackwood to testify to what transpired at the meeting of March 4 in Dachner's office in San Francisco. He was first asked as to what part Thorwaldson was to play and he explained that Thorwaldson was to have the sale of the stock and the proposed corporate setup, and the "right to sell stock in California" was apparently discussed at some length. He testified also as to the discussion of the necessity of having an audit made before any deal could be concluded. When asked if there was any mention made at that meeting with respect to the building of a mill by Dachner the witness answered: "Well, I believe it was conceded generally that * * * Mr. Dachner was the man that could build this mill for us; he was familiar

with what had to be done, and he had been introduced to various ones of us by Mr. Somers; and, as I recall it was just understood that he was to build it." Defendant moved to strike this remark and the court in denying the motion said: "He may testify as to his conclusion, based upon what took place in the discussion among all those people and, if his conclusion is faulty and not based on the facts, it isn't of any more value than anyone else. But, if the conclusion is based upon what took place at that time between the persons, then his conclusion is subject to such weight as it may have relation to the facts." Blackwood further testified that between the March 4, 1946 meeting in Dachner's office and the May 27, 1946 meeting at Boyle's office in Reno no change had been made to his knowledge in the status of any pending agreement except the fact that Thorwaldson had dropped out and that Blackwood and Conner would finance the proposition—would advance the required $150,000.

Blackwood was finally asked on cross examination if he ever remembered seeing a contract of any kind in writing pertaining to the payments and the amounts to be paid and when and where. This followed a reference to the plaintiff's exhibit No. 6 which was a letter dated April 8, 1946 from plaintiff to defendant offering to build and install a mill for $100,000 payable in five stipulated payments aggregating that sum. Blackwood replied: "I do not recall seeing the contract, but I have heard about it, and I had heard about it at that time, or I wouldn't have been writing a check." He was then asked whether he referred to a formal written contract, a specific contract, or letters that were written from time to time, and he replied: "I am referring to the moral aspect of it." He was then referred to the letter of April 5, 1946 in which the officers of the company notified the plaintiff that the directors *had authorized the officers to enter into a contract,* and he indicated that that was what he considered the contract.

Conner was also called to testify as to what occurred

at this meeting. Most of it was taken up by Thorwaldson's discussion of plans for financing. Then Conner was asked if there was any discussion of the construction of a mill. He testified:

"Yes, a mill was discussed and the selling of stock, or other—whatever was proposed in there—money raised by that proposal was to pay for the mill.

"Q. Who was to build that mill, if that were discussed? A. Mr. Dachner."

The foregoing references have to do only with the testimony of the plaintiff's witnesses and without consideration of any of the denials made by the officers and witnesses of the defendant. The plaintiff did not call Thorwaldson or Peterson to testify as to what took place at this or any other meeting. They were not at any time sworn as witnesses in the trial. It is clear that the plaintiff failed entirely to prove that a contract was entered into between the parties at the meeting of March 4, 1946.

The asserted contract of April 5, 1946, is evidenced by plaintiff's exhibit No. 5, which is in the following words:

"Exhibit No. 5[2]

"Union Lead Mining & Smelter Co.

"First National Bank Building

"Carson City, Nevada

"Warren E. Baldy
"Sec. and Treas.
"April 5, 1946

"Pacific Machinery & Supply Co.,
    "156 Montgomery Street,
    "San Francisco, California
"Gentlemen:

    "At a special meeting of the Board of Directors of

[2]Although defendant maintains that this letter was written at the insistence of plaintiff so that plaintiff could "have something to show" when he returned to California to arrange for the financing with Thorwaldson, Conners, Peterson and others, we treat the letter under plaintiff's theory that it came from defendant pursuant to its own judgment and desires and without solicitation or suggestion from plaintiff.

the Union Lead Mining & Smelter Company held this 5th day of April, 1946, at the office of the Company at Room 7, First National Bank Building, Carson City, Nevada, a resolution was adopted authorizing the proper officers of the Company to enter into an agreement with the Pacific Machinery & Supply Company of San Francisco to erect and construct on the property of the Company a Selective Flotation Mill with a capacity of from 100 to 125 tons per twenty-four hours at a cost of $100,000 and with the further understanding that the said Pacific Machinery & Supply Company would advance to the Company the sum of $50,000.00 for the purpose of retiring certain obligations of the Company. And the Officers of the Company were further authorized to secure the said total sum of $150,000.00 by executing a mortgage running to the said Pacific Machinery & Supply Co. covering all the physical assets of the Union Lead Mining & Smelter Co., including ore in the mine, and the said $150,000.00 to be repaid out of production at the rate of 20% of the gross returns from the sale of concentrates.

"Respectfully,

"Union Lead Mining & Smelter Co.
(Signed) "By John H. Somers,
"President.
(Signed) "By W. E. Baldy,
"Secretary."

This is patently not a contract. Consider in this connection the testimony of Dachner in which he described the nature of the mill to be installed. It took him approximately 800 words to give only a summation of the items without detail of any kind, to say nothing of the numerous blueprints that were admitted in evidence and for which the engineers are said to have been paid over $3,000. It is, as it purports to be, a letter stating that the directors had authorized the officers to enter into a contract for the construction of a mill. While a few general terms are outlined, it is so patent that

the minds of the parties did not meet on any contract by virtue of the instrument itself that the same cannot by any stretch of the imagination be called a contract. Nor is it an agreement to enter into a contract. Such contract would necessarily have provided for items mentioned in Dachner's summation, including among others, construction of the Galena Creek cofferdam, pipeline, pump, electrical equipment, transmission line, automatic devices, storage tanks, pipeline to mill, treatment of product leaving mill, conditioner tanks, flotation cells, filter material, fire protection system, compressor house, domestic water supply, rebuilding of crusher plant, installation of "grizzly," connection with Symon's cone crusher, jaw crusher, primary bin, bucket elevator, mantle, increase of crusher capacity, rewiring of electric motors, magnetic switches, armored cable, rewiring electrical installations, new switches, construction of 4-mile power line, installation of transformers, primary disconnector, and distribution panels, etc. It will also be noted that if this instrument is the one on which plaintiff relies as his written contract, it makes no mention of any requirement that defendant submit an audit as a condition precedent to plaintiff's advancement of $50,000. It should also be noted that three days later plaintiff wrote a rather detailed letter outlining what he proposed to do and when and in what installments the price must be paid. Defendant never accepted the terms of such proposal. Further, Dachner testified that on April 5, "I was practically at the half-way mark, *in the sense of spotting machinery, having tentative plans formulated, sketches made * * *.*" And his letter of April 8, 1946, he himself, identifies as a "proposal."

Dachner, insisting that he had a written contract, was asked on cross examination, "When did you give it?" He replied: "Oh, I presented it first, to the gentlemen, Mr. Thorwaldson and Mr. Blackwood and Mr. Peterson. I believe it was on the March 8th meeting * * *. I had worked on these plans on the primary work *for*

*about a month or more.* (In this the witness must have been in error. It would date the beginning of his efforts as about the first of February, whereas nothing is claimed before March 4.) Mr. Somers was always after me *for a final figure* on the final *presentation,* the facts. I said 'John, as soon as I have it you shall have it.' Now at this meeting we held immediately after I finished my figures, I called these gentlemen in and says, 'Here they are,' and on the same day I sent a copy of it to Mr. Somers."

It subsequently developed that the date referred to was probably April 8 instead of March 8. This tallies with the witness's testimony that he had been working on the matter for about a month. In any event it seems clear that Somers was waiting for Dachner to submit plans and estimates. This was definitely done by a letter prepared by Dachner, dated April 8, but which was misaddressed to a different company in San Francisco and was never received by the defendant, who first received a copy of such letter in July. Such letter dated April 8, 1946 is addressed to the directors, the Union Milling and Smelting Co., successors to the Union Lead Mining and Smelter Co., San Francisco, California, and states in part: "In accordance with the understanding reached some time ago *we have compiled the necessary information* requisite to the modernization of the present installation * * * and the machinery necessary for erection of a milling plant * * *." The letter then lists eight items in some detail as an apparent outline for the basis for a contract, lists the complete price as $100,000 with a down payment of $19,000, and four deferred payments. These five payments aggregated $85,000—"The balance to be taken out of production based on 20% of the gross value of concentrates sold or stock in the new company."

The letter comprises two pages of single spaced typewriting. It apparently is the first information given by plaintiff to defendant of even the general nature of

the proposed installation. According to the plaintiff it was handed to the financial group immediately upon its complete preparation on April 8, 1946, with a copy misaddressed to the defendant and the original of which the defendant never did see but saw a copy for the first time the following July. It is also the first communication or advice that purports to outline the method of payment—one cash payment, four deferred installment payments and a final payment of $15,000 for which defendant was apparently given an option to pay by taking 20% out of gross proceeds of concentrates or by stock in the new company. It is apparent that in addition to agreeing to the terms of a detailed contract other important points were left open for negotiation. This is clear without further elaboration. The only possible logical and legal conclusion is that the letter of April 8 was simply an offer. It was never accepted. Conner also testifies to the April 8 (10), 1946 meeting; that the letter of April 5 was submitted there. Somers was not present.

However, March 10 is also definitely identified in the testimony as a general meeting of directors and stockholders. At this meeting there were present Somers, the president and general manager of the defendant, Baldy, secretary-treasurer, Floe, a director, McFarland, McMillan, Conner and Baldy's secretary. Dachner testifies: "It was a general directors and stockholders meeting and they—various propositions that Mr. Thorwaldson presented to them were discussed and none of them was adopted and I believe the minutes of that meeting are on file here—in evidence." This was the meeting previously referred to by Dachner as being called pursuant to the San Francisco meeting of March 4th. At that time he says that it was decided in order to bring the whole project before the board of directors to call a special meeting at Carson City "to ratify all of the agreements, verbal agreements, that had been made between Mr. Thorwaldson, Mr. Somers and myself.

Something official should come out of the corporation's directorate to make it authentic—so a meeting was called for March 8."

Conner definitely identifies this meeting as being on a Sunday, which would make it March 10th, and identifies the same persons as being present at Mr. Baldy's office at Carson City. This also corresponds with the penciled date on Thorwaldson's memo of that meeting. Conner says that Thorwaldson took up most of the day discussing the "new setup" and eventually dictated "a proposal" to Baldy's secretary. Conner made the penciled notes on back—personal notes made later. "(They) have nothing to do about this." He says that the money raised by that proposal was to pay for the mill. The typed memo dictated by Thorwaldson reads as follows:

"We propose to set up a new company and issue new 5% $100.00 par convertible preferred stock and also $1.00 par common stock on the following basis:

"To the holders of the present outstanding 6% Production Certificates, the new convertible preferred stock for each $100.00 actual cash invested, and 110 shares of new $1.00 par common for each $250.00 in services rendered as a bonus.

"To the stockholders of the Nevada Ore Reduction Co., we propose to issue one share of new convertible preferred for each $100.00 actually subscribed in the stock of the Nevada Ore Reduction Co. and a bonus of 20% of new common stock.

"To take care of the item listed in the balance sheet of the Union Lead Mining & Smelter Co. under 'Deferred Liabilities,' an adjustment be made in each case under which some cash is to be paid to the creditor or the stockholder and the balance in the new convertible preferred stock of the new company."

This was signed by nobody, accepted by nobody, was binding on nobody. On the back of the paper is the following penciled memorandum made by Conner: "1st. auditor's report in its entirety. Engineering reports,

maps, record of smelter returns to property. 2. Change in B of D (board of directors). 3. Change in management. 4. — 30-day irrevocable option with privilege of unrestricted access to the property and its records—copy auditor's report—copy of all engineer's reports—copy of smelter reports."

This is relied on to support Dachner's testimony that the furnishing of the auditor's report by defendant was a condition precedent to Dachner's payment of $50,000 to pay the company's debts. It can have no such effect under the circumstances.

Respondent read in evidence the minutes of the directors' meeting held at Carson City, March 10, 1946. These minutes, however, deal entirely with Thorwaldson's offer to incorporate a new company for $2,500,000 comprising 5,000 shares of convertible preferred stock of the par value of $100 per share and 2,000,000 shares of common stock at $1.00 per share. The new corporation was to take over all of the assets of the old corporation, the old stockholders were to be taken care of, likewise the holders of the outstanding 6% production certificates, likewise the stockholders of the Nevada Ore Reduction Company, likewise items of deferred liabilities. After the formation of such new corporation *Thorwaldson* was to erect and construct a 100-ton unit flotation mill or to erect a smelter if that seemed most feasible and advantageous. The minutes further showed that such offer could not be accepted without disposing of an ore milling agreement with the Nevada Ore Reduction Company nor could the appellant corporation bind the stockholders of Nevada Ore Reduction Company or the production certificate holders, but it was resolved that Thorwaldson's proposal be accepted subject to the approval and agreement of such other interested parties and subject to certain adjustment of items included in the deferred liabilities. The minutes made no mention of any contract with Dachner and did not even mention his name. As heretofore noted Conner, a wit-

ness for plaintiff, was asked if there was any discussion at this meeting about the construction of the mill. He said, yes—that the money raised by Thorwaldson's proposal was to pay for the mill. He was then asked, "Who was to build that mill, if that were discussed? A. Mr. Dachner." Yet Dachner insisted when testifying that this meeting fixed the conditions that had been agreed upon in connection with the construction of the mill and with which the defendant corporation was required to comply—"the conditions that had been agreed upon as of March 10th—the contract that was originally made— the one which I have always based my whole work and plans—the one adopted by the Board of Directors on March 10th." It is evident that there is nothing in these minutes constituting a contract.

RENO MEETING OF MAY 27, 1946

As testified to by Conner he was present at this meeting, which was also attended by Somers, McFarland, Dachner and Boyle. The parties were present in Reno at that time over Thursday, Friday and Saturday, May 26, 27 and 28. At the meeting Boyle prepared a typed memo as follows:

"1st:   Books to be experted By C.P.A.
"2nd:   Corporation—all common should be placed in hand of tax expert as to whether it should be all common or part preferred.
        2,500,000 shares par value_____$1.00
"3rd:   All people come back on cash basis—6% per year for each year payable in stock. Rule of 2 to 1 prevails as in Sec. 6 hereof.
"4th:   Dachner, Somers, Boyle to sign checks.
"5th:   Stock to be sold on cash deal. The parties that come in now shall have a better standing.
"6th.   Mr. Dashner and Mr. Conners to be put up $150,000.00 to take stock at 50¢ a share, which will be 300,000 shares of stock. (No commission).

"Mr. Dascher to have full supervision of construction of mill, and to operate same for 60 days after completion.

"John to raise buildings—all materials to be used for re-construction Dascher's responsibility.

"Mr. Dascher's expenses for construction and operation of mill to be allowed for operation period. ($500.00 a month.)

"Re-incorporation of present structure to be determined by Baldy, Boyle and C.P.A.

"Legalize in California—see to it.

"Title search."

Conner testified that it was agreed at that meeting that all of the items above listed "would have to be done before the $50,000 was paid and $100,000 balance raised and turned over for a mill." This, however, had to do with the relationship of the investors to the defendant corporation and possibly to Dachner. As to supporting any theory of a contract made at that meeting between defendant and plaintiff for the construction of a mill by the plaintiff the only testimony is as follows:

"Q. Now, what was the $100,000 to be used for? A. The erection of a flotation plant.

"Q. And that was to be done by whom? A. The plant to be built by Mr. Dachner.

"Q. Was there any discussion about the mill situation and its progress at that time and place? A. Mr. Dachner reported progress *as to plans, specifications,* and stated that he was ready to go ahead the minute the money was ready, and the money couldn't be ready until the deal was cleared up."

Conner had theretofore paid $5,000 to Dachner. He repeated again the six things that were to be done before the $50,000 was to be paid to the company and that the failure to perform these things was the reason that the $50,000 had never been delivered to the company, that the witness was always ready to produce it. Blackwood also testified to what transpired at this meeting. He

first testified that no money was to be advanced till compliance with several requirements, including the auditor's report etc. Then: "My understanding was that the mill was to be built. Mr. Dachner was to build a mill, continue to get the materials together for the deal * * * I know that he had been told to build a mill on previous occasions, and to my thinking he was still instructed to build a mill * * *. But I don't recall whether there were any specific instructions directed toward him or not at that meeting." He testified that he knew that between the March 4 meeting and the May 27 meeting Dachner had had engineering plans drawn, a test and analysis run, had placed orders for a ball mill and classifiers and a great portion of the machinery that he already had.

Conner and Dachner drove to the mine on July 19, 1946 and met Somers and Blackwood. Somers and Dachner had a conversation that Conner did not hear, but later they had a meeting with Mr. Baldy in the latter's office. The deal was again discussed and Dachner and Conner were asked to put their proposition in writing. They dictated to Mr. Baldy's stenographer, who later became ill and the notes were not transcribed, so Conner returned to San Francisco and mailed a proposition, under date of July 23, 1946, which was promptly rejected. Conner also testified that during all this time, up to the time this proposal was rejected, Somers knew that Dachner was going ahead with the building of the mill as far as he could. Dachner's testimony concerning the June and July negotiations only strengthens the conclusion that even at this late date the parties (the plaintiff and his financial associates on the one hand, and the defendant on the other) were still negotiating as to the financing, and that the actual production of the necessary funds resulting from such financing was essential to the construction of the mill.

Plaintiff introduced a letter from Somers (plaintiff's exhibit 16), dated March 23, 1946, in which Somers

explained that he had another group ready to finance the company if the San Francisco financing was not consummated. In the letter Somers wrote: "Again don't get tied up unless enough is put up to go through and no new Co. now. This one is being reorganized to fit this picture." At the beginning of the letter he wrote: "Your letter received and am glad that you feel like going ahead. But first be sure that a minimum of $150,000 is pledged before we start. Otherwise I feel Baldy & Mack won't feel like giving a mtg."

Dachner had testified that he was ready to perform his contract on May 1, 1946. This in turn was tied in to a wire he had sent Somers April 14, 1946 as follows:

"With four thousand in addition to fifteen thousand already received and balance guaranteed me per my schedule April 8 I can start construction of plant Wednesday May 1st you to shut down on that day clear buildings of lumber and ·machinery and turn all your men over to me until job is completed or released by me. Think with everybody cooperating transfer can be made in time to supply fifty thousand cash and balance of money for project as needed. Prefer delaying trip as I can rush job by staying here for present but will come if imperative."

But Somers replied to this wire the following day rejecting the suggestions and saying: "But one thing sure I don't close down until the mill is fully financed. Money in bank to your credit. No gamble and no squeeze."

### THE LETTER OF APRIL 17, 1946

This is constantly referred to by Dachner as confirming the asserted oral contract to build the mill and as authorizing such construction. But such interpretation of the letter is entirely without foundation. The letter is in response to the plan submitted by Attorney M. C. Crimmins, Jr., of San Francisco for the incorporation of a new company with specified purposes, capitalization,

etc. Crimmins's firm, it will be remembered, were Thorwaldson's attorneys whose fees in the matter were advanced by Dachner as an accommodation to Thorwaldson. The April 17 letter gives six detailed and numbered reasons why the requirements of the Crimmins plan "are not agreeable to us." The letter proceeds: "So we now propose the following." A detailed plan is then outlined in seven separate paragraphs covering proposed amendment of the corporation's present articles, increase of capital stock, issuance of preferred and common shares, calling in the old shares, increasing the board of directors, qualifying the corporation in California, temporarily financing by mortgage the construction of a mill, paying a 10% commission for raising the money, and optional provisions for discharging the mortgage with corporate stock. Mr. Crimmins's letter was a proposal. The defendant's letter of April 17 was a rejection and a counter proposal. The one clear conclusion to be drawn from the letter is that the whole matter, including the financing of the company and the construction of the mill, was still in the negotiating stage.

The court in denying a motion made by defendant to strike a certain answer of the witness Blackwood stated: "It is the witness's own method of explaining how he arrived at the conclusion that there was a contract." After further protest by defendant's counsel the court said: "Just a moment. Maybe I can help you out a little. Taking into consideration the two letters that have been shown you, and the other meetings and conferences that you testified to, did you determine from all those things put together that, to your satisfaction, Mr. Dachner had a contract?" Blackwood answered:

"I did, Judge.

"Mr. Boyle: Well, I object to that on the ground it calls for a conclusion of the witness. The documents themselves speak for themselves, your Honor. What

(construction) he puts on it doesn't make any difference. The court has to do that. * * *

"The court: "The objection is overruled and the motion to strike is denied."

In the 600 page transcript and the 106 exhibits there is naturally a great deal of evidence that cannot be discussed within the scope of this opinion. We have covered most of the material evidence relating to the trial court's finding as a matter of law that the parties had entered into a contract for the construction of the mill. Many letters were received in evidence, some entirely immaterial and some containing suggestions and propositions by one party or the other which were in turn either definitely rejected or left without action. A number of the letters from Somers to Dachner keep insisting that he should not proceed until the financing is definitely settled. They warn him repeatedly of this.

Throughout the entire situation it becomes manifest that so far as concerns the abortive attempts of the parties to enter into a contract there were three distinct parties or groups, (1) the defendant corporation, Union Lead Mining & Smelter Co., (2) Dachner, the alleged contractor, and (3) the group of people who were financing the project. Any construction of the mill was inextricably bound to the financing of the cost thereof, which was estimated at $100,000 and which would also necessitate the furnishing of approximately an additional $50,000 to pay off certain production certificates and other debts. This was essential because the production certificates were secured by a deed of trust upon the corporation's property and the plan involved a first mortgage to secure the repayment of the $100,000 as well as the $50,000. The three groups were at a constant impasse. Somers, the president and general manager of the defendant corporation, was constantly importuning Dachner for action, and such desired action appeared to be the submission of his plans and specifications to indicate just what he proposed to do

for the $100,000 and the submission as to what progress was being made in making the $150,000 available. The financial group on the other hand were continually pressing Somers either directly or through Dachner to submit his audit so that they would know that the $50,000 to be advanced by them would free the corporation of all claims. Dachner was likewise pressing Somers for the audit and was also meeting with the financial group to accomplish the financing. In the course of the negotiations Thorwaldson, who had pledged $5,000, dropped out, but Conner and Blackwood had each paid $5,000 to Dachner. Dachner quite definitely identified himself with the financial group and it appeared quite clearly at times that the negotiations continued between Dachner and the financial group on the one hand and the corporation on the other. After testifying that he presented his plans for the mill to Thornwaldson, Blackwood, Conner and Peterson, Dachner was asked on cross examination why he presented the plans to them before presenting them to Somers. He answered:

"They were vitally interested because they were—

"Q. They were vitally interested? Now, to what extent? A. Of giving me the money for it.

"Q. In other words, it is not a fact that you looked upon them to finance this matter and to pay for the construction of the mill? A. Of course. I knew that Mr. Somers had no money. That is why he came to us."

Appellant attacks plaintiff's complaint and also the court's findings as not being within the issues made by the pleadings or supported by the evidence. The complaint alleged that on or about the 1st day of January, 1946 (later amended to reach March 4, 1946) defendant requested plaintiff "to draft plans and install a mill * * *; that pursuant to said request plaintiff did draft plans, purchase and deliver machinery and material * * * and incurred expenses at the request of defendant as follows:" There are then alleged items of metallurgical and engineering expense, payments on account

of machinery and lumber, payment of watchman's services for the guarding of the lumber, salaries for engineering inspection and service, telephone, telegraph and traveling expenses and $15,000 lost profit, all aggregating the sum of $27,038.92. Upon the submission of the case the plaintiff voluntarily withdrew his claim for items aggregating $1,576.85, and the court rendered judgment for the balance, being the full amount claimed by plaintiff, $25,462.07.

■ It is unnecessary for us to discuss the legal aspects of a situation under which lost profits are recoverable for a breach of contract, as it is evident from a mere recital of the testimony that plaintiff and defendant never did enter into an oral contract for the construction by the former of a mill for the latter. The only testimony that could have supported a finding that the parties had entered into an oral contract was the testimony of Dachner, Blackwood and Conner to their respective conclusions that this had been done, although none of them testified even remotely as to what the terms or conditions of such oral contract were. The trial court apparently accepted the conclusions of these witnesses. It is just as clear that there was no written contract. Both the plaintiff and the plaintiff's attorney tied themselves down definitely to the specific conversations, meetings, letters, memoranda, etc., upon which they relied for the establishment of such contract. Irrespective of the contradictions and discrepancies in such claims, a most careful scrutiny of all the evidence offered fails to establish a contract. The judgment for $15,000 lost profits is accordingly in no way authorized, justified or substantiated by the evidence.

■ The situation as to plaintiff's right to recover for the other items claimed by him involves greater difficulty. Astonishing as the situation was, with two men of business experience and ability such as Somers and Dachner, with their plans and their activities in the midst of negotiations that arrived nowhere, there were

circumstances justifying some of Dachner's claims to reimbursement. Thus on April 14, 1946 (when Thorwaldson was still working with Dachner and had pledged a $5,000 contribution to the financing), Somers wrote Thorwaldson complaining of the sidetracking of Dachner's mortgage deal, but stating: "However the machinery is arriving for the mill, and I will arrange to pay for it just the same as if there was no deal pending." And on April 15 Somers, while insisting in a letter to Dachner that he would not start the mill with "partial financing," nevertheless wrote: "The cells you have here I will pay for and any other machinery received." In his constant insistence that Dachner submit his plans, Somers knew that Dachner was employing engineers for the purpose. A designing engineer, Herman A. Ruth, in the employ of the engineering firm of Hamilton, Beauchamp & Woodworth inspected the property with Somers' assistance on April 4, 5 and 6, pursuant to which a set of 12 blueprints for the mill were prepared and submitted to Dachner on April 30. Somers was cognizant of the purpose of Ruth's visit to the property. Somers furnished Dachner with ore samples for metallurgical tests. Had a contract been entered into for a "turn-key job," such contract might indeed have provided that the engineering expense be included in the lump sum price. The complaint alleged that "the defendant requested the plaintiff to draft plans" and that "pursuant to said request the plaintiff did draft plans." The complaint further alleged that plaintiff had employed the engineers to draw the plans and to make metallurgical tests, etc., at the special instance and request of the defendant and that plaintiff had expended $3,879 on this item. The court's written findings were to the effect that this sum (reduced to $3,229) had been paid by plaintiff "in pursuance of the obligations placed upon him by said contract to build said flotation mill and in the performance of the same," and that sum "was the reasonable value of said services rendered to plaintiff by reason of the

obligations incurred by plaintiff pursuant to the contract between himself and defendant." No amendment in the pleadings was sought by the plaintiff in this regard. The confusion and inconsistency between the quantum meruit pleaded by the plaintiff and the liability on contract found by the court under findings drafted and submitted by the plaintiff and objected to by the defendant are obvious. If the court had found this item due by reason of the quantum meruit pleaded by the plaintiff, the finding would be binding upon us as it has substantial support in the evidence. This applies to a greater or less degree to many of the other items for machinery, services and expenses. As to items expended by the plaintiff for machinery, these of course could be items of damage only to the extent that plaintiff was actually damaged after taking into consideration resales of such machinery or the value of such machinery still in the plaintiff's possession. Indeed plaintiff testified that, under advice of his attorneys requiring him to minimize his damage, he had made disposition of a number of such items.

■■ At the close of the oral arguments to the trial court plaintiff submitted to the court a list in condensed form of the items and amounts of the damages claimed. This list was not introduced in evidence, but appellant's counsel has set it forth in his opening brief and respondent has taken no exception thereto, so we may assume its accuracy. The total of the sums is the precise amount for which the court rendered judgment, and the items appear to coincide with the court's findings. One item included in such list and in the findings and in the judgment is an item of $500 paid to Messrs. Crimmins, Kent & Draper of San Francisco. The evidence shows conclusively that the services of these attorneys in drafting a new proposed corporate structure and the necessary steps to be taken in compliance with the requirements of the California Corporate Securities Act and of the Federal Securities and Exchange Commission were ren-

dered on behalf of Thorwaldson, and that Dachner advanced the attorney fees as an accommodation to Thorwaldson. The only theory of liability for this item advanced by respondent is that such legal work was incidental to his alleged contract to build the mill. This theory we must reject as without reason or foundation. Incidentally it may be mentioned that the complaint fixes this item in the sum of $327 and was not amended in this respect.

The expense account submitted by the plaintiff was allowed by the court in its entirety. Some of the items thereof would appear to be in the same category as the attorney fee paid on behalf of Thorwaldson and not chargeable against the defendant, but it is difficult to extricate these from Dachner's expenditures in compliance with Somer's constant insistence that Thorwaldson and his associates or Conner and Blackwood complete and submit their plans for financing.

It is evident from what we have said that the judgment must be reversed and the case remanded for a new trial, as the pleadings and findings cannot be modified in this court to meet the situation. It is accordingly ordered that the judgment and the order denying appellant's motion for new trial be, and the same hereby is, reversed and the case remanded to the district court for a new trial in accordance with the views herein expressed, and pursuant to such amendments in the pleadings as may be allowed in the discretion of the court and in accordance with any terms and conditions it may reasonably impose and whether made before such new trial or before submission of the cause in order to conform with the proofs. The appellant will recover its costs on this appeal.

HORSEY, J., and BROWN, District Judge, concur.

EATHER, Chief Justice, being absent on account of illness, the Governor commissioned HON. MERWYN H. BROWN, of the Sixth Judicial Court, to sit in his stead.