LITTLE SUSITNA CONSTRUCTION
COMPANY, INC., Appellant,

v.

SOIL PROCESSING, INC., Appellee.

No. S–7451.

Supreme Court of Alaska.

Aug. 1, 1997.

21

Roger E. Holl, Anchorage, for Appellant.

M. Gregory Oczkus, Anchorage, for Appellee.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

BRYNER, Justice.

This appeal arises from a dispute centering on a "turn-key" provision in an equipment lease.

## I. FACTS AND PROCEEDINGS BELOW

In September of 1992, Little Susitna Construction Company, Inc. (LSC) negotiated with the United States Army Corps of Engineers and the Small Business Administration (SBA) for the award of a contract to remediate fuel-contaminated soil at Fort Richardson. On September 4, 1992, in contemplation of being awarded the contract, LSC entered into a "turn-key" lease agreement with Soil Processing, Inc. (SPI).

The agreement called for SPI to provide LSC with thermal soil-remediation equipment on-site at Fort Richardson "at the turn key price of $44.00 per ton" of soil processed. SPI was also to receive $5,500.00 for mobilizing its equipment and an equal sum for de-mobilizing. In addition, the agreement provided that LSC would pay SPI $3,000.00 for each day of stopped production.[1]

LSC originally planned to begin processing soil in mid-October and to complete the project in the first week of December. On September 28, 1992, the Corps of Engineers and SBA formally awarded LSC the Fort Richardson contract. On October 5, LSC notified SPI to proceed with mobilization. SPI had its equipment on-site by October 15.

Before actually getting underway, however, the project encountered significant delay. LSC did not begin remediating soil until the first week of January 1993. This delay forced operations to be carried out in adverse conditions. Freezing weather led to numerous equipment breakdowns and reduced the productivity of the workforce; the soil became much more difficult to process when frozen. Repairs and a five-month extension in the period of operation significantly increased LSC's costs on the project.

As a result, LSC withheld payments from SPI. LSC claimed that SPI was responsible for the delays, repairs, and all related costs. LSC also claimed that SPI failed to provide equipment and services it had contracted to supply. LSC eventually received contract payments of $681,647.99 but paid SPI nothing.

SPI sued LSC for breach of contract, seeking damages of $189,692.92 under the terms of the lease agreement. LSC counterclaimed for negligence and breach of contract, seeking damages of $312,843.00. The case came to trial before a jury in Anchorage. Upon conclusion of the evidence, the trial court entered a directed verdict for SPI on its equipment lease claim, determining that, at the contract rate of $44.00 per ton of soil processed, SPI was due $178,200. The court submitted all remaining issues to the jury. The jury returned a special verdict finding in SPI's favor and rejecting all but a minor portion of LSC's counterclaim. The trial court entered judgment for SPI in the principal amount of $176,133, to which it added pre-judgment interest of $47,275 and attorney's fees of $24,840.81. LSC appealed.

## II. DISCUSSION

### A. Meaning of Agreement's "Turn–Key" Provision

On appeal, LSC focuses initially on the "turn-key" provision of the September 4, 1992, lease agreement.

At trial, LSC requested a jury instruction defining the term "turn-key" to require SPI to assume all risks arising from weather-related and other job-site problems. The trial court declined to define turn-key, instead leaving the jury to decide the term's meaning:

> In order to find for [LSC] on this claim, you must find that it is more likely than not that both parties understood and intended, or reasonably should have understood and intended, that "turn key" as used in this lease meant that SPI would pay for all damages to [LSC] resulting from weather or other problems on the job.

---

1. On September 1, 1992, three days before entering into the above-quoted equipment lease, LSC and SPI signed a separate "Letter of Understanding/Service Agreement" in which SPI obtained the right of first refusal to provide LSC with soil remediation equipment for all government work offered to LSC in the next three years. As part of the letter of understanding, SPI agreed to screen and approve personnel to operate the remediation equipment, and LSC agreed to hire all SPI-selected employees at specified rates.

The jury's special verdict concluded that SPI did not breach its contract by failing to pay for labor costs incurred by LSC as a result of job-site equipment problems.

LSC challenges the trial court's failure to define turn-key, arguing that "turn-key is a legal term of art and a legal term with legal meaning." In LSC's view, " 'a turn-key job' is any job or contract in which a contractor agrees to complete the work to a specified point and to assume all risks." LSC maintains that by agreeing to furnish thermal remediation equipment to LSC "at the turn key price of $44.00 per ton," SPI bound itself as a matter of law to absorb all added costs resulting from equipment breakdowns or freezing weather throughout the course of the soil remediation project. LSC insists that the trial court should have determined that this is what turn-key meant, that the court should have instructed the jury accordingly, and that there was no evidence to support the jury's verdict declining to find a turn-key breach.

 Interpreting a written contract is generally a task for the trial court; however, interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points toward conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning. *Alaska Diversified Contrs., Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 584 (Alaska 1989); *Restatement (Second) of Contracts* § 212(2). In such cases, the trial court initially determines whether the extrinsic evidence meets the criteria to create a jury question; when the court finds that the extrinsic evidence does not conflict or is incompatible with the terms of the written contract, interpretation remains a question of law for the court's determination. *Alaska Diversified*, 778 P.2d at 584; *Alaska N. Dev.,*

*Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 39 (Alaska 1983).

 This court exercises its independent judgment when reviewing a trial court's decision to leave interpretation of a contract to the jury. *Cf. Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 (Alaska 1982). In contrast, we give deferential review to the jury's verdict interpreting the contract: we do not reweigh the evidence but ask only whether it creates room for diversity of opinion among reasonable people. *Municipality of Anchorage v. Baugh Constr. & Eng'g. Co.*, 722 P.2d 919, 927 (Alaska 1986). We must affirm the verdict unless the evidence to support it is completely lacking or so slight and unconvincing as to make it manifestly unreasonable and unjust. *United Bonding Ins. Co. v. Castle*, 444 P.2d 454, 455 (Alaska 1968).

We first consider whether the evidence at trial pointed toward conflicting interpretations of the lease agreement's turn-key provision. The President of SPI testified that the turn-key provision meant nothing more than, "I supply the equipment, they turn the key on and it starts." SPI also presented evidence that, after the project was already underway, LSC sought a contract modification imposing all risks of operation on SPI; LSC's actions implied that the original contract did not impose these risks on SPI. LSC, on the other hand, claimed that it included the turn-key provision in the lease agreement for the express purpose of ensuring that SPI would bear all risks of operation. LSC claimed that the originally proposed price of the contract had been increased as a result of its insistence on adding the turn-key provision.[2] This evidence unquestionably presented conflicting interpretations of the lease agreement's turn-key provision.

We next consider whether SPI's proposed interpretation of the turn-key provision is necessarily inconsistent with the express terms of the lease agreement.[3] LSC con-

---

**2.** SPI conceded that the turn-key provision had been added to the lease agreement contemporaneously with an increase in the contract price, but it produced evidence indicating that the price hike reflected an equipment requirement also added at that time.

**3.** "[I]f '[SPI's] asserted meaning [is not] one to which the language of the writing, read in context, is reasonably susceptible,' " then interpretation of the contract should have remained a matter of law, and the jury should have been informed of the contract's legal meaning. *Alaska N. Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 39 (Alaska 1983) (quoting *Restatement*

tends that SPI's proposed interpretation of "turn-key" is incompatible with the accepted legal definition of the term. To support this contention, LSC relies on case law and Black's Law Dictionary. However, the cases LSC relies on all deal with either building contracts or oil drilling contracts.[4] Likewise, while Black's Law Dictionary does define a turn-key contract as one requiring "all risks to be assumed by [the] contractor," Black's does not purport to define this term generally, but only as "used in [the] building trade" and "[i]n [the] oil drilling industry."[5] Neither the case law nor the dictionary attaches a fixed meaning to "turn-key" when the term is used in other types of contracts.

LSC has thus failed to establish that turn-key has any settled legal meaning in the context of an equipment lease agreement. Use of the term in this unfamiliar setting almost inevitably generates uncertainty as to its intended meaning.

Notably, even as commonly applied in oil drilling and construction contracts, the term could arguably support allocating all operational risks to LSC. In the oil industry, for example, the turn-key driller bears all responsibility for difficulties encountered while drilling a well (but is not responsible for problems that arise after the well's delivery to the owner); in fact, the driller does not even guarantee a producing well. *Totah Drilling Co. v. Abraham*, 64 N.M. 380, 328 P.2d 1083, 1091 (1958). This allocation of risk would seemingly favor SPI's argument that it only bargained to furnish a functioning soil decontamination machine, with LSC to bear all risks during operation.

Moreover, courts encountering turn-key provisions in novel contexts have not hesitated to look beyond the definition typically applied to the term in construction and oil drilling cases. For example, in explaining its willingness to go beyond the term's usual meaning, the court in *Smithco Eng'g, Inc. v. International Fabricators, Inc.*, 775 P.2d 1011 (Wyo.1989), quoting Justice Holmes, stated:

"A word is not a crystal, transparent, and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." The use of the term "turn key" does not abrogate the general rule that the entire contract must be considered to determine the meaning.

*Id.* at 1015–16 (quoting *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918)) (citation omitted).[6]

---

*(Second) of Contracts* § 215 cmt. b (1979). Accord *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 n. 4 (Alaska 1991); *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 584 (Alaska 1989).

**4.** LSC cites *Dachner v. Union Lead Mining & Smelter Co.*, 65 Nev. 313, 195 P.2d 208, 211 (1948) (defining 'turn-key job' as used in a construction contract); *Totah Drilling Co. v. Abraham*, 64 N.M. 380, 328 P.2d 1083, 1091 (1958) (defining "'turnkey contract' in the oil industry"); *Retsal Drilling Co. v. Commissioner, IRS*, 127 F.2d 355, 357 (5th Cir.1942) ("a turn key job has a fixed and definite meaning in the [oil] industry"); and *T.K. Harris Co. v. Commissioner, IRS*, 112 F.2d 76, 78–79 (6th Cir.1940) (noting the "ordinary" meaning of "turnkey contract" in an oil drilling case).

**5.** Thus Black's states, in relevant part, that a "turn-key contract" is a

Project in which all the owner need do is "turn the key" in the lock to open the building with nothing remaining to be done and all risks to be assumed by contractor. Term used in building trade to designate those contracts in which builder agrees to complete work ...

to certain specified point, such as building a complete house ready for occupancy as a dwelling, and that builder agrees to assume all risk.

In the oil drilling industry .... [a] turn-key contract to drill a well involves the testing of the formation contemplated by the parties and completion of a producing well or its abandonment as a dry hole, all done for an agreed-upon total consideration, putting the risk of rising costs, well trouble, weather, and the like upon the driller[.]

Black's Law Dictionary 1516 (6th ed.1990) (citations omitted).

**6.** In *Smithco*, International Fabricators, Inc., (I.F.I.) agreed to supply movable louvers for installation by Smithco in a large construction project and agreed to "provide a turn key or total responsibility service to Smithco[.]" *Smithco*, 775 P.2d at 1013. After Smithco installed the louvers, design problems arose, preventing them from operating efficiently and necessitating costly modifications by Smithco. *Id.* at 1014. Smithco withheld a portion of I.F.I.'s contract price, and I.F.I. sued. *Id.* The trial court construed the contract to hold Smithco liable for the modification costs. *Id.* On appeal, Smithco

A final measure of the turn-key provision's ambiguity in the present case may be found in the language of the equipment lease agreement itself. One clause in the agreement specifies that SPI will provide "[a]ll required parts, oil, grease, for maintenance of equipment. No penalty charges or damages may be attributed or charged to SPI for down time." This clause suggests that SPI's repair responsibilities were meant to be limited to routine maintenance. Another clause guarantees SPI $3,000 a day or $175 an hour for the time value of its equipment if LSC or even a third party government agency "request[s] the processor to stop production." This suggests that the onus was on LSC to assure that processing not be interrupted. When read as a whole, the lease agreement thus undermines LSC's claim of certainty as to the turn-key provision's meaning.

LSC highlights several clauses of its September 1, 1992, service agreement with SPI. The agreement's preface provides that "[i]f soil conditions materially change, prices and quotes will be subject to change by mutual agreement." The fourth clause provides that the plant will be operated on a round-the-clock basis "until completion of the project or work is stopped due to inclement weather."

At first blush, these portions of the service agreement appear to be in tension with the lease agreement, particularly its provision for a $3,000 per day standby rate. However, unlike the lease agreement, which was project specific, the service agreement set conditions for all dealings between the parties over the ensuing three-year period. More-over, the September 1 service agreement and September 4 equipment lease agreement are separate contracts; as a separate contract, the service agreement amounts, at most, to extrinsic evidence of the lease agreement's meaning—a point serving to illustrate LSC's tacit recognition of the ambiguity of the lease agreement itself.

All of the foregoing considerations support the trial court's conclusion that the lease agreement's turn-key provision was ambiguous and that the extrinsic evidence pointed to two competing meanings, each viable and neither inconsistent with the agreement's plain terms. Given these circumstances, the trial court properly instructed that the task of interpreting the agreement was a factual matter for the jury. *Alaska Diversified*, 778 P.2d at 584.

■ By concluding that the extrinsic evidence supported reasonable but conflicting interpretations of the contract and thereby made interpretation a jury question, we have necessarily determined that the jury would have acted reasonably in accepting either of the conflicting interpretations. The evidence supporting SPI's claim that LSC bore the burden of costs resulting from equipment breakdown is neither slight nor unconvincing; this evidence creates room for diversity of opinion among reasonable people. It is therefore sufficient to support the jury's verdict. *Municipality of Anchorage v. Baugh Constr. & Eng'g. Co.*, 722 P.2d 919, 927 (Alaska 1986). LSC's claim to the contrary is groundless.[7]

---

claimed that the trial court "failed to give effect to the term 'turnkey.'" *Id.* at 1012. The Wyoming supreme court affirmed, stating that it agreed "with the trial court in this factual situation, regardless of the term's ['turnkey"'s] more normal meaning." *Id.* at 1015.

See also *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 681–83 (5th Cir.1989) (contractor who signed a turn-key agreement to build and lease to a shipper a shipping container storage facility "capable of [its] intended use" held not liable for subsequent problems in the facility despite the "well-defined meaning in law and in fact [of a turn-key contract]," given that contractor relied on shipper's faulty representations in building the facility).

7. LSC raises three related points which require only cursory discussion.

The trial court instructed the jury that "if you cannot decide whether … a particular promise was made, you may construe the contract against the party who drafted the relevant portion[.]" LSC argues that the jury should have been required to construe any ambiguity against the drafting party—SPI. LSC's proposed rule, however, applies only to contracts of adhesion where the parties are "of such disproportionate bargaining power that the insured could not have negotiated for variations in the terms of the standard policy." *Graham v. Rockman*, 504 P.2d 1351, 1357 (Alaska 1972). *See Duncan v. City of Fairbanks*, 567 P.2d 311, 313–14 (Alaska 1977); *Hahn v. Alaska Title Guaranty Co.*, 557 P.2d 143, 144–45 (Alaska 1976). Here, the lease agreement was negotiated at arm's length between equally situated parties.

B. *Jury Instructions on Breach of Warranties*

■ On a separate front, LSC attacks the instruction that the trial court gave the jury on breach of express and implied warranties. At trial, LSC maintained that SPI had breached express and implied warranties concerning the condition, processing capacity, and fitness for winter use of its thermal remediation unit. Specifically, LSC claimed that SPI had expressly promised that its equipment was in good condition and could process soil at a steady rate of at least six to ten tons per hour. LSC also claimed that SPI had given implied assurances that the equipment was capable of maintaining optimal performance throughout the winter.

SPI denied giving LSC any guarantees about the processing capacity of the equipment and also denied making any representations—express or implied—about the equipment's fitness for use in the core winter months of January, February and March. SPI's position was that both parties had originally contemplated beginning the remediation project in mid-October and completing it by mid-December, that LSC had caused startup to be delayed until January, and that most of the subsequent delays had resulted from inclement winter weather and frozen-solid soil.

LSC contends that there was insufficient evidence to support the finding that it had the duty to pay for labor for repairs of the leased equipment under the terms of the lease and letter of understanding of the parties. This point largely duplicates LSC's principal contention that the evidence did not support the verdict on the turn-key contract issue. To the extent LSC contends that the combined provisions of the September 1, 1992, letter of understanding and the September 4, 1992, lease agreement unambiguously established the parties' intent to allocate to SPI the duty of paying for labor and repairs, the argument is unpersuasive.

LSC contends that there was insufficient evidence to support the jury's conclusion that SPI performed the mobilization and demobilization requirements of the lease agreement. In large measure, this contention depends on LSC's mistaken view that "turn-key" is a term of art with a fixed legal meaning. If LSC means to argue something else, its argument is unclear and has no discernible merit. The parties presented disputed evidence concerning the meaning of the mobilization and demobilization requirements in

With respect to implied warranty, Instruction Number 18 stated:

The law assumes that if SPI, at the time of making the contract, had reason to know of a particular purpose for which the leased equipment was required, and if [LSC] was relying on the skill or judgment of SPI to furnish the equipment, then there is an implied warranty that the equipment is fit for that purpose.

The court more specifically addressed LSC's theory of the case in Instruction Number 19:

In deciding whether the implied warranty of fitness for a particular purpose was breached, you may have to decide whether the cold weather in January, February, and March 1993 was the cause of some or all of the problems on the job. If you find that the weather was a factor, you must decide whether [SPI] had a responsibility to give [LSC] written notice sufficient to alert [LSC] that the machine was not fit to operate in such cold weather. [SPI] had a responsibility to give [LSC] such notice if the equipment was not fit for a particular use which [SPI] knew or reasonably should have known would be part of the Fort Richardson contract.

[LSC] contends that at the time the agreement was made with SPI, [SPI] knew, or reasonably should have known,

the lease agreement. There was sufficient evidence before the jury to allow it to conclude that the words "mobilization" and "demobilization" had a more limited meaning in the lease agreement than they did in the Corps of Engineers' contract with LSC. The trial court did not err in submitting the issue to the jury.

LSC suggests that inclusion in the equipment lease agreement of a heading stating "REF: CONTRACT DACA 85–R–007"—an apparent reference to LSC's then-pending contract with the Corps of Engineers—had the effect of incorporating the LSC/Army Corps contract into the LSC/SPI equipment lease agreement, thereby making the LSC/Army Corps contract control various terms of the LSC/SPI lease agreement, such as the meaning of the lease agreement's mobilization and demobilization requirements and the anticipated time for SPI's completion of its soil remediation efforts. LSC's incorporation by reference theory lacks merit. As we stated in *Prichard v. Clay*, 780 P.2d 359, 361 (Alaska 1989), "[p]arties do not undertake obligations contained in a separate document unless their contract clearly says so."

that [LSC] contemplated using the equipment during cold winter weather such as occurred during January, February, and March 1993. SPI denies that [it] had reason to know this. If you find that it is more likely than not that SPI should have given [LSC] written notice sufficient to alert [LSC] that the equipment was not warranted for use in cold weather, and if you further find that cold weather caused problems with the equipment, then you must find that SPI breached its implied warranty of fitness.

LSC objected to the latter instruction, requesting additional language stating, in conformity with UCC § 2A–214, that an implied warranty could be modified only by a clear, conspicuous written disclaimer. The trial court denied LSC's request, finding that it was "not necessarily appropriate to incorporate directly and in total sales provisions of the UCC to equipment leases." The challenged instruction thus remained intact, requiring "written notice sufficient to alert [LSC]," of SPI's disclaimer of any implied warranty of fitness for winter use, but omitting the requirement that this written notice be clear and conspicuous. In its special verdict, the jury found that SPI had breached no express or implied warranties.

On appeal LSC renews its claim that the jury instructions should have required a clear and conspicuous written disclaimer of SPI's implied warranty of fitness for intended winter use. Given the facts of the case, however, this claim lacks merit.

As reflected in Jury Instruction No. 19, SPI's defense to LSC's implied warranty claim was that no warranty could be implied because SPI had no reason to know that "[LSC] contemplated using the equipment during cold winter weather such as occurred during January, February, and March 1993." In other words, SPI essentially asserted that it had no reason to disclaim fitness for winter use because neither party contemplated winter use when the contract was signed.

The additional language LSC asked the court to include in Instruction No. 19—the challenged instruction—would have required a clear and conspicuous written disclaimer of any implied warranty by SPI. The express language of the instruction, however, already specified that any implied warranty could be disclaimed only by a "written notice sufficient to alert LSC." Thus, LSC's requested addition to the instruction could have had significance only if the jury had heard evidence suggesting the existence of some written disclaimer by SPI that was arguably unclear or inconspicuous. But the jury heard no evidence suggesting the existence of any disclaimer whatsoever, let alone a written disclaimer. Had the jury found an implied warranty, it would have been left with no rational basis for concluding that the warranty had been disclaimed in any way. Hence, in context, LSC's proposed addition to Instruction No. 19 was superfluous.

LSC raises no other challenge to the implied warranty instruction, nor does the instruction otherwise appear inappropriate. *See* UCC § 2A–213. The trial court did not err in giving it.

### C. *Expert Witness Issue*

 LSC next raises an evidentiary point, challenging the trial court's decision to allow Bob Langberg to testify as an expert witness. Langberg was LSC's Contract Manager and Job Manager. He participated in the negotiation of LSC's agreement with the Corps of Engineers. LSC's answer to SPI's complaint included a third-party complaint naming Langberg as a defendant. Langberg was evidently deposed and subpoenaed to testify as a fact witness while still a party. He apparently settled with LSC shortly before trial.

At trial, SPI moved to qualify Langberg as an expert witness on the impact of cold weather on construction equipment, noting his thirty years' experience in the construction industry in Alaska. Counsel for LSC objected. The trial court, citing Langberg's experience, allowed him to testify as an expert on this subject. LSC now complains that Langberg lacked educational and experiential qualifications to testify as an expert on cold weather impacts.

 We review a trial court's decision to qualify an expert witness only for abuse of discretion. *Colt Inds. Operating Corp. v.*

*Frank W. Murphy Mfr. Inc.*, 822 P.2d 925, 932 (Alaska 1991). Alaska Evidence Rule 702 allows a witness to be qualified as an expert on the basis of experience alone. The record and briefs indicate that Langberg had thirty years' experience in the Alaskan construction industry. We find no abuse of discretion in the trial court's decision to allow Langberg to be qualified as an expert on the impact of cold weather on construction equipment.

■■■■ At any rate, Langberg never actually testified about the impact of cold weather on construction equipment. Instead, he was questioned at length about his personal knowledge of the contract negotiations, his understanding of the meaning of particular terms in the contracts, and his understanding of industry usage. Although LSC now argues about Langberg's lack of expertise in cold weather impacts, its complaints address only Langberg's testimony concerning SPI's contract negotiations with LSC and the meaning of the resulting equipment lease agreement. Langberg addressed these matters as a fact witness testifying from personal knowledge, not as an expert witness. His personal knowledge of these matters and his involvement in this case qualified him to express his opinion as a lay witness. *See* Alaska Rule of Evidence 701; *In re D.J.A*, 793 P.2d 1033, 1036 (Alaska 1990). *See also Reutter v. State*, 886 P.2d 1298, 1309 (Alaska App.1994).[8]

### D. *Award of Attorney's Fees*

■■■■ LSC lastly challenges the trial court's award to SPI of $47,275 in prejudgment interest and $24,840.81 in attorney's fees. The trial court calculated prejudgment interest from the date of service of process. This date is appropriate "[e]xcept when the court finds that the parties have agreed otherwise[.]" AS 09.30.070(b).[9] LSC contends that the parties here agreed otherwise, because, under the terms of the service agreement, SPI agreed to receive periodic contract payments "as directed" by SBA. According to LSC, at the inception of this litigation, SBA directed that contract funds be deposited in a court account. LSC reasons that SPI thus had no right to the funds and was entitled to no interest until the court entered judgment.

This argument is specious, since SBA sheltered the funds only because LSC contested its obligation to pay SPI. Moreover, in its response to SPI's post-trial motion for prejudgment interest, LSC conceded that "[t]he number of days of prejudgment interest calculated by plaintiff is essentially correct." We find no error in the award of prejudgment interest.[10]

■■■■ The trial court based its award of attorney's fees on the schedule specified in Civil Rule 82(b). LSC contends that the trial court abused its discretion by not departing

**8.** LSC cursorily argues for the first time on appeal that Langberg should have been precluded from testifying as an expert because he failed to file a pre-trial witness report, as required by Alaska Civil Rule 26(a)(2)(B). Even if it were adequately preserved, this argument would be meritless, as Rule 26(a)(2)(B) applies only to "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony[.]" Langberg does not fit this description.

**9.** In relevant part, AS 09.30.070(b)provides:
[P]rejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier. The written notification must be of a nature that would lead a prudent person to believe that a claim will be made against the person receiving the notifica-

tion, for personal injury, death, or damage to property.
Given the second sentence of the above-quoted passage, it is questionable whether this statute applies to cases other than tort claims for personal injury, death, or damage to property. *See McConkey v. Hart*, 930 P.2d 402 (Alaska 1996). If AS 09.30.070(b) were inapplicable here, a longer period of prejudgment interest would result, since breach of the contract and the due date for payment on the contract both predated the service of process. However, the parties appear to agree that subsection (b) applies to this case; we accept this agreement and apply the statute for purposes of this decision only.

**10.** LSC sets out a conclusory assertion that the parties agreed on a different rate of interest than the statutorily specified rate of 10.5 percent. *See* AS 09.30.070(a). LSC fails to explain this assertion, and the record fails to support it.

downward from the schedule on the basis of Civil Rule 82(b)(3)(I), which provides that "[t]he court may vary an attorney's fee award ... [to the extent that] a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts[.]" LSC has failed to explain, either below or on appeal, how this provision might apply to its situation, particularly since SPI initiated the litigation and LSC made no "voluntary use of the courts." We find no error in the attorney's fee award.

## III. *CONCLUSION*

The judgment is AFFIRMED.