Ralph COLLINS, Cornelia Collins, Ronald Collins, and Eric W. Collins, Appellants,

v.

Andrew BLAIR, Trina M. Blair, Ricky Blair, and F/V Predator, Inc., Appellees.

No. S–9810.

Supreme Court of Alaska.

Aug. 9, 2002.

Rehearing Denied May 20, 2003.

614(7)

Melvin M. Stephens, II, Kodiak, for Appellants.

Paul D. Kelly, Kelly & Patterson, Anchorage, for Appellees.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Andy Blair and Ralph Collins began their business relationship in 1987 when Blair chartered Collins's boat. Blair bought the boat two years later, along with an undetermined interest in prospective fishing rights. A dispute over these fishing rights arose in 1994 and the parties entered into a joint venture, forming a closely held corporation. After more problems with fishing rights and a general deterioration in the relationship, Blair petitioned the court for an involuntary dissolution of the corporation. The court dissolved the corporation and ordered a distribution of assets that followed a proposal submitted by Blair. Collins appeals from this order. Because the trial court's factual findings are not clearly erroneous, we affirm the order of dissolution. However, because Blair used corporate funds to pay both corporate and personal legal bills, we reverse the superior court's order awarding attorney's fees and remand for an allocation between corporate and personal services.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 1987 Andy Blair chartered the F/V MILKY WAY from Ralph Collins. Included in the charter was an option to purchase the vessel (option agreement). Paragraph 21 of the option provided for the transfer of fishing rights for halibut and/or black cod (sablefish) if a limited entry permit system were instituted by federal authorities.[1] In 1989, when Blair purchased the F/V MILKY WAY from Collins, the purchase agreement referred to the option agreement as being the entire agreement of the parties, regardless of any collateral, prior, or contemporaneous agreements.

In 1995 the federal government adopted a program to regulate the halibut and black cod fisheries in Alaska through an Individual Fishing Quota (IFQ) system. To implement the IFQ program, applications were sent to each vessel owner or charterer who had a fishing history in the qualified fisheries for each of the years 1984 through 1990. Blair received an application for the F/V MILKY WAY for the years 1988 to 1990. Collins received an application for the F/V MILKY WAY that covered the years 1984 through 1987. The National Marine Fisheries Service (NMFS) awarded IFQs based on the F/V MILKY WAY's catch to Blair (based on his catch from 1988 to 1990) and to Collins (based on his catch from 1984 to 1987).

As paragraph 21 of the option agreement provided for the transfer of the F/V MILKY WAY's fishing rights, the court found at trial that there was conflict between Blair and Collins over the pre–1988 quota shares allocated to the F/V MILKY WAY under the IFQ program. Blair contacted attorney Joe Sullivan to determine the best way to recover the pre–1988 shares to which he felt he was entitled. Sullivan suggested that, rather than contest his claim through expensive litigation, Blair pursue a joint venture with Collins.

In 1994 Blair and Collins entered into an agreement to begin a joint venture. The agreement, an intent to purchase drafted and signed without counsel, stated that Collins intended to purchase a 50% interest in the F/V MILKY WAY and that Collins and Blair were to combine their halibut and sablefish shares. The parties approached attorney Sullivan to prepare the paperwork to implement their joint fishing venture. They chose to do this through F/V PREDATOR, Inc. (the corporation), a corporation previously formed by Collins that was eligible to hold IFQs. The corporation was chosen because the IFQ regulations required that IFQ transfers be made only to an entity that existed during the qualifying period, and the corporation met

---

**1.** Paragraph 21 states:
 *Limited Entry Permits:*
 It is agreed that if a limited entry fishing permit system is instituted with respect to halibut and/or black cod in Alaska, the Owner

shall assign any and all rights he may have with respect to his usage of the vessel in those fisheries to Charterer to enable Charterer to obtain such limited entry permits.

this requirement. Collins represented that the F/V PREDATOR (a fishing boat, not the corporation) had companion fished with the F/V MILKY WAY. The boats' quota shares, Collins maintained, would therefore be about equal.

Blair agreed to transfer his post–1988 F/V MILKY WAY shares to the corporation. Collins had F/V PREDATOR shares that he was going to issue to the corporation. Neither party specified how many shares he would contribute. After the corporation received a loan from the bank, Collins purchased a 50% interest in the F/V MILKY WAY and the accompanying fishing rights. The F/V MILKY WAY was then transferred to the newly-formed corporation.

Blair never transferred his F/V MILKY WAY quota shares to the corporation due to a dispute with NMFS over the division of shares between his catch on the F/V MILKY WAY and his catch on his other boat. Blair did, however, fish his F/V MILKY WAY shares on the F/V MILKY WAY in 1995 and deposited all proceeds into the corporation's bank account.

When Collins had his F/V PREDATOR shares issued to the corporation, he became ineligible to personally receive other quota shares (the lost shares) to which he would have been entitled. After talking with NMFS about a way to rectify the situation, Collins transferred to himself personally the F/V PREDATOR shares that had been issued to the corporation. NMFS then issued Collins his lost shares. Collins apprised Blair of his actions and gave him the F/V PREDATOR shares to fish on the F/V MILKY WAY. Although Blair fished the F/V PREDATOR shares in 1995, he had Sullivan contact Collins on behalf of the corporation and himself requesting that Collins return to the corporation the shares Collins had withdrawn. Sullivan eventually forced the transfer of Collins's shares back to the corporation. Upon the return of the shares to the corporation, NMFS revoked Collins's lost shares.

## B. Proceedings

In September 1996 Blair filed suit in superior court alleging that Collins's action in withdrawing the F/V PREDATOR shares from the corporation was a breach of Collins's fiduciary duty. He requested an accounting and reimbursement and asked the court to dissolve the corporation under Alaska law.[2] Collins counterclaimed alleging that Blair violated his fiduciary duty by failing to contribute his F/V MILKY WAY shares to the corporation. Collins also petitioned the court for a recision of the option and intent to purchase agreements entered into by Blair and Collins and the return of all assets Collins contributed to the corporation.

Because the case involved issues of dissolution and liquidation of a closely held corporation—issues that were complicated by IFQ contributions—a special master was appointed. In June 1998 Special Master Gregory L. White, a certified public accountant, prepared a report that reviewed transactions, rendered an accounting, and recommended alternate methods for dissolution, sale, or liquidation of the corporation.

In making his recommendations on the division of assets, Special Master White made several findings of fact. Most importantly, he found that neither the intent to purchase agreement nor the actual purchase of the F/V MILKY WAY constituted a settlement of any claims of the parties. Although Blair's 1987 option agreement and 1989 purchase of the F/V MILKY WAY may have resulted in his acquiring the quota shares generated by Collins's fishing on the F/V MILKY WAY prior to 1988, the special master found that the joint venture was not entered into in order to settle Blair's claims to Collins's F/V MILKY WAY shares.

Special Master White also found that Blair had an obligation to contribute approximately 50,000 pounds of halibut shares to the corporation and that Collins did not agree to contribute additional shares to make up the difference between the pre–1988 F/V MILKY WAY shares and the F/V PREDATOR shares actually contributed to the corporation. The

---

**2.** Alaska Statute 10.06.628 generally provides that certain persons may seek the involuntary dissolution of an Alaska corporation. It sets out the grounds for involuntary dissolution and provides that certain interested persons may intervene in an action for involuntary dissolution.

special master then recommended that Blair's interest be redeemed by distributing certain assets of the corporation, including the F/V MILKY WAY and all its fishing rights, and that Collins be allowed to retain 100% of the stock of the corporation, including most of the fishing rights arising from the operation of the F/V PREDATOR. The report also recommended that Blair be charged for his personal legal and professional fees that had been paid by corporate funds.

In May 1999 Superior Court Judge Michael L. Wolverton issued a decision and order dissolving the corporation. The court found that paragraph 21 of the option agreement (calling for the assignment of all fishing rights to Blair if a limited entry fishing permit system was instituted) indicated that the assignment of rights was "part and parcel of the purchase price of the vessel." The court found that when NMFS began allocating quota shares, Collins "flaunted" the fact that he had been awarded shares for his fishing of the F/V MILKY WAY prior to the boat's lease and sale to Blair, which shares Blair thought he was entitled to under the option and purchase agreements.

The court found that Blair, rather than approaching Collins in a confrontational manner and asking for a formal settlement, proposed the joint venture as an informal settlement of the rightful ownership of the pre–1988 F/V MILKY WAY fishing rights. After trial the court found that Blair had proven his version of the facts by a preponderance of the evidence and that his proposed distribution of the assets was the most equitable.

The court found that neither Blair nor Sullivan acted improperly in obtaining for the corporation the F/V PREDATOR shares withdrawn by Collins, and that, because Blair had not acted improperly, he should not be charged for the legal fees paid by the corporation. The court also found that Collins had to account for the difference between the F/V

MILKY WAY shares pledged to the corporation and the F/V PREDATOR shares actually contributed.

As for the dissolution, the court agreed with the master's recommendation that an equitable distribution was warranted. The court adopted Blair's proposal for the liquidation of the corporate assets and adopted all of the master's recommendations for adjustments to the corporate books, with the exception of the legal fees charged to the corporation by Blair. After the final master's report was issued and adopted and judgment entered, the court awarded Blair attorney's fees pursuant to Alaska Rule of Civil Procedure 82(b)(2), increasing the award under Rule 82(b)(3) because of the complexity of the issues, laws, and facts in the case and Collins's unjustified violations of his fiduciary duties.

Collins appeals from this order and award.

## III. STANDARD OF REVIEW

We accept a superior court's findings of fact unless they are clearly erroneous.[3] A finding of fact is clearly erroneous "if it leaves [us] with a definite and firm conviction on the entire record that a mistake has been made."[4]

Interpretation of a contract is a question of law.[5] However, where extrinsic evidence is presented by the parties to clarify a contract's meaning, that evidence points to conflicting interpretations of the contract, and the contract is reasonably susceptible to either meaning, the proper interpretation of the contract becomes a question for the trier of fact.[6] When an appellant challenges the trial court's findings relating to the intent and actions of the parties, we review those findings under a clearly erroneous standard.[7]

**3.** *State, Dep't of Revenue v. Merriouns,* 894 P.2d 623, 625 (Alaska 1995).

**4.** *City of Hydaburg v. Hydaburg Coop. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993) (internal quotation marks omitted).

**5.** *Little Susitna Constr. Co., Inc. v. Soil Processing, Inc.,* 944 P.2d 20, 23 (Alaska 1997).

**6.** *Id.*

**7.** *Oaksmith v. Brusich,* 774 P.2d 191, 195 (Alaska 1989).

We review an award of attorney's fees under an abuse of discretion standard.[8] A superior court abuses its discretion "when, after reviewing the whole record, we are left with a definite and firm conviction that the trial court erred in its ruling." [9]

## IV. DISCUSSION

### A. The Superior Court's Factual Findings Are Supported by the Evidence and Are Therefore Not Clearly Erroneous.

In arguing that the trial court erred in setting aside or ignoring the master's factual findings, Collins argues that the trial court erred in substituting its own factual findings for that of the master.[10] Blair responds that whether the trial court made clearly erroneous findings was waived by Collins, in that Collins only challenged the trial court's setting aside of the master's findings, not the trial court's own factual findings. Collins counters by stating that if the trial court is allowed to disregard the master's findings, Judge Wolverton's findings must then be reviewed for clear error. Blair's waiver argument is unpersuasive. Collins specifically mentions in his brief that one of the trial court's findings was without evidentiary support and indicates in each instance where he argued that the trial court erred in setting aside the master's findings that he was also challenging the trial court's findings. Accordingly, he did not waive his challenges to Judge Wolverton's factual findings.

The testimony at trial and during the master's depositions was conflicting.[11] In making his factual findings, Judge Wolverton does not cite to the record. He did say, however, that he found Blair's version of the events that transpired between Blair and Collins to be more valid than Collins's version. When determining whether a trial court has made a clearly erroneous finding, "[d]ue regard shall be given to the opportunity of a trial judge to weigh the credibility of witnesses." [12] As to each of Collins's claims of erroneous findings, there is testimony to support Judge Wolverton's findings.

### 1. The intent to purchase agreement reflected a settlement of a dispute between Blair and Collins.

In rejecting the master's finding that the joint venture was not a settlement of the dispute over the pre–1988 F/V MILKY WAY shares, the superior court stated that "[h]owever denominated, the July, 1994 agreement had a legal force and effect which, de-facto, settled the claims between the parties."

Blair testified at trial he had paragraph 21 of the lease and option agreement put in so that he could guarantee his right to fish if a limited entry system were ever implemented. He stated that when he applied for his quota shares, he sent NMFS the option and purchase agreements. NMFS told Blair that they were not going to get involved in litigation over who was the proper owner of the pre–1988 F/V MILKY WAY shares and that Blair should contact an attorney. Blair then contacted attorney Sullivan, who told him that to contest the contract would take a great deal of time and money. Sullivan suggested that Blair try to work it out with Collins personally.

In setting up the joint venture, Blair stated that he thought the deal favored Collins because Blair was not going to try to exercise his rights under the option and purchase agreements. Under the agreement, Blair would get only 55% of the pre–1988 F/V

---

**8.** *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 380 (Alaska 2001).

**9.** *Id.* (citing *Stosh's I/M v. Fairbanks N. Star Borough*, 12 P.3d 1180, 1183 (Alaska 2000)).

**10.** This argument is made explicitly only in regards to the trial court's finding that the intent to purchase and purchase agreements were a settlement of the dispute over who owned the pre–1988 F/V MILKY WAY shares. The rest of Collins's arguments are phrased in terms of the trial court error in setting aside or ignoring the master's findings, with no reference to the trial court's findings.

**11.** In making his findings of fact, Special Master White stated that he "had to reach an understanding of the facts. This was complicated by conflicting testimony." Where Collins's and Blair's testimony conflicted, Special Master White "considered whose explanation was more plausible given the circumstances at the time, and knowledge of how the fishing industry operates."

**12.** *Barios v. Brooks Range Supply, Inc.*, 26 P.3d 1082, 1085 (Alaska 2001).

MILKY WAY shares to which he felt he was entitled. Though Collins could get less than what he had put into the corporation, Blair felt that the agreement was fair in light of the option agreement. If, Blair testified, he had not gone through with the joint venture, he feared that he would have been caught up in litigation and therefore unable to fish. Blair stated that the 1994 intent to purchase was a settlement before there was an overt dispute between Collins and himself. Blair's description of the transactions between himself and Collins supports the trial court's finding that the intent to purchase was, in effect, a settlement.[13]

**2. Collins agreed to contribute additional shares in order to make up the difference in landings between the F/V MILKY WAY and the F/V PREDATOR.**

■ The order issued by the superior court stated that the evidence showed that

Collins represented that the F/V PREDATOR shares could be substituted for the F/V MILKY WAY shares because Collins thought they were identical. While the superior court did not find that Collins intentionally misrepresented the amount of shares he was going to contribute, the fact that he was to contribute all of his F/V MILKY WAY shares meant that he would need to make up any difference that resulted from his substitution of the F/V PREDATOR shares.

Blair testified that the corporation was entitled, under the agreement, to Collins's F/V MILKY WAY shares. Blair testified that the F/V PREDATOR shares were used because the F/V MILKY WAY shares could not be contributed to the corporation. The corporation was entitled to an amount equal to Collins's F/V MILKY WAY shares.[14]

**3. Blair did not agree to contribute approximately 50,000 pounds of halibut shares to the joint venture.**

■ The superior court's decision does not indicate how many pounds of halibut

13. At trial, Blair testified as follows:
Q: Now do you believe the deal you made that day and the deal we're talking about today [the joint venture agreement], favored you or Mr. Collins?
A: I think it favored Mr. Collins.
Q: Why do you say that?
A: Because I wasn't exercising my—the 1987 agreement, we were combining everything together, so actually I was—yeah, that's why.
. . . .
Q: And if you hadn't made this deal, what would 1995 have looked like to you?
A: I don't think it would have been good for— no, we would've been tied up in conflict so [his quota shares] would've been tied up.
Q: Did Mr. Collins ever ask you for a better deal than the one that you think is described in that intent to purchase agreement?
A: No. No.
. . . .
Q: And that's why you think this offer was fair?
A: According to our 1987 agreement . . . I think it was fair, yes.
. . . .
A: Like I said, Ralph and I never had any dis— actual dispute because I think we—we settled it in the 1994 agreement.

14. At trial, Blair testified:
Q: So you were entitled to what?
A: Milky Way shares.
Q: An amount equal to the Milky Way shares, is that right?
A: Yes. Yeah, that's what we both talked about.

A: Well, that we'd—we had to put Predator shares in the Predator, Inc. because he couldn't put Milky Way shares in the Predator, Inc.; it wasn't allowable, I guess.
Q: Okay.
A: So—so, that's—that was the big—that's what they were talking about.
Q: Was there any discussion that resolved any question about the amount of quota shares that would be put in an order to comply with the July 5 agreement?
A: Well, Ralph said, well, we'll have to put the Predator in, but it's about equal to the Milky Way because—because they fish right along side each other for all those years. It's got about the same amount of fish, so it'll—it'll be the same anyway, so no big deal.
Q: So at that point you were no longer talking about putting in Milky Way shares into a business, you were talking about putting Predator shares into a business, is that right?
A: That's correct.
Q: And the amount of shares, in your mind, was satisfied by a representation that the Predator shares equaled the Milky Way shares?
A: That's correct.
Q: Correct?
A: That's correct.
Q: And Mr. Collins was telling you—how did he explain to you that they were approximately the same?
A: He said they fished the same years and . . . .
Q: They meaning what, please?
A: The Predator boat and the Milky Way, he owned them both at the same time. They

shares Blair was to contribute to the joint venture. The special master, on the other hand, found that, although not explicitly pointed out by the parties, it seemed "reasonable to expect" that Blair would contribute approximately 50,000 pounds.

Blair testified that when he and Collins were discussing the joint venture, they figured they would need about 100,000 pounds of halibut shares in order to succeed. He also stated that they did not discuss how much each party was going to contribute to the corporation. They never mentioned that each party would contribute 50,000 pounds. Rather, they were going to combine all of their shares together, as the intent to purchase agreement indicated. As Blair's shares were unclear due to the dispute with his other vessel, he could not know how many shares he had to contribute.

### 4. Collins's actions to recover his lost sablefish shares were wrongful.

■ The trial court found that Collins never explained to Blair or attorney Sullivan his reasoning behind his withdrawal of the pre–1988 F/V MILKY WAY corporate assets. The court found that had Collins advised Blair or Sullivan of his intentions, the relationship between the parties would not have deteriorated.

The lost shares at issue are sablefish shares from 1986 and 1987 landings on the F/V MILKY WAY. To qualify for sablefish shares, a person (defined as an individual or a corporation) must have owned or leased a vessel that caught sablefish with fixed gear during any quota share qualifying year,[15] which for these shares would have been 1988, 1989, 1990, or part of 1991.

In his initial application, Collins asked that his quota share be allocated to the corporations that owned the F/V PREDATOR and the F/V MILKY WAY, that is, the F/V PREDATOR,

Inc. and the F/V MILKY WAY, Inc.,[16] respectively. However, this prevented Collins from receiving the lost sablefish shares: F/V PREDATOR, Inc. could not receive those shares because it was not a successor in interest to the F/V MILKY WAY, Inc., and F/V MILKY WAY, Inc. could not receive the shares because it was leasing the vessel to Blair during the qualifying years of 1988–1991. Blair was unable to receive the shares because he neither owned nor leased the vessel during 1986 or 1987. Collins could not receive the shares because he was not eligible, as the corporation owned the F/V MILKY WAY. The shares, therefore, were lost.

NMFS, though, informed Collins that F/V PREDATOR, Inc. was a qualified person for sablefish shares as it had owned the F/V PREDATOR during the qualifying years and had a qualifying landing of sablefish. To obtain his lost shares, Collins asked NMFS to rescind the quota shares allocated to the F/V PREDATOR, Inc. and F/V MILKY WAY, Inc. and reallocate them to him personally. As F/V PREDATOR, Inc. was generally permitted to receive sablefish shares, personally receiving F/V PREDATOR shares enabled Collins to qualify under the regulations to obtain the previously lost F/V MILKY WAY 1986 and 1987 shares.

However, the problem with this solution was that Collins was not permitted under the corporation's bylaws to unilaterally remove quota shares. NMFS thought at the time it transferred the F/V PREDATOR, Inc. shares to Collins that he was the sole stockholder of the corporation. When Blair informed NMFS of the true ownership and rights of F/V PREDATOR, Inc., NMFS rescinded its action. The trial court's decision, then, that Collins acted wrongfully in removing the F/V PREDATOR, Inc. quota shares is supported by the evidence.

---

**15.** 50 C.F.R. § 679.40(a)(2)(i) (2001).

**16.** Collins was the sole stockholder of F/V MILKY WAY, Inc.

fished right along side each other that they—they'll have the same amount of shares so shouldn't be a—any big deal, any problem, should be the same, should be equal.

## B. The Superior Court Did Not Err in Ordering the Distribution.

██ Collins argues that the distribution ordered in the special master's final report does not reflect a 55:45 distribution when one considers the "hard assets" owned by the corporation and who contributed them. Collins claims that there were hard assets totaling approximately $1.6 million and that he had contributed at least 74% of that total. In the distribution, however, Collins received approximately $425,000, 26% of the hard assets. Blair argues that the distribution ordered by the court was consistent with the evidence presented at trial. Given that the pre–1988 F/V MILKY WAY shares were Blair's, Blair argues that Collins received 45% of the rights to which he had no viable claim.

The superior court ordered the distribution of assets according to the proposal presented by Blair. The court found that an equitable distribution was "the only sensible solution." It adopted Blair's proposal in order to "maximize the value of the assets available for distribution and to avoid dissipation by adverse tax consequences that may result from denominating the result as a recision."

In Blair's liquidation proposal, Blair received 54.96% of the corporation's assets and Collins received 45.04%. This comports with the 55:45 share of stock owned by each party. Before the superior court, Collins did not explain what constituted the hard assets he claimed. Without a clear indication of the assets Collins referred to and who contributed those assets, the trial court did not abuse its discretion in awarding a distribution based on each party's respective stock holdings.

## C. The Superior Court Did Not Err in Finding that Blair Did Not Violate His Fiduciary Duties.

██ Collins states that Blair breached the covenant of good faith and fair dealing by intentionally deceiving Collins. He argues that this breach was ongoing during their relationship. Collins also argues that Blair, the majority and controlling shareholder in the corporation, had an obligation to treat Collins fairly. Blair argues that he acted properly in carrying out the intent to purchase and in the best interests of the corporation in his retrieval of the corporate quota shares withdrawn by Collins.

██ Stockholders in closely held corporations owe one another a fiduciary duty.[17] The superior court found that Blair had done nothing wrong in petitioning NMFS for the return of the withdrawn quota shares. Given Collins's reticence in discussing his reasons for his withdrawal of the quota shares, the court found that, rather than breaching a fiduciary duty, Blair was acting in the best interests of the corporation in recouping the corporation's assets. Furthermore, the court stated that Blair, though in a dispute with NMFS over his own quota shares, fished those shares for the benefit of the corporation the first year and should contribute the earnings from the other years in the final distribution.

In petitioning NMFS for the return of the withdrawn shares, Blair made clear the corporation's reasons for seeking a return of the shares. Furthermore, the dispute with NMFS over the proper allocation of Blair's shares is well documented. Since the superior court ordered that Blair's failure to fish his shares for the corporation after 1995 be accounted for in the special master's final report, the court did not err in its decision that Blair had not violated his fiduciary duties.

## D. The Superior Court Erred in Allowing Blair To Use Corporate Funds To Pay His Personal Legal Expenses.

██ Collins argues that the trial court erred in reversing the special master's decision to require Blair to pay his legal fees, rather than allowing him to pay his fees with corporate funds. Blair argues that the fees incurred were fees of the corporation as they were incurred during attempts to recover corporate assets converted by Collins and during the ensuing litigation over the corporation's accounting and liquidation.

**17.** *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 276 (Alaska 1980).

The special master found that charging the corporation for counsel that primarily represented Blair and attempted to settle the dispute by having Collins contribute shares while Blair contributed nothing was not proper, especially because Collins was not able to charge the corporation for his legal fees. The superior court, though, finding that neither Blair or Sullivan had acted improperly, disagreed with the special master's conclusion. The superior court allowed Blair to recover all of his legal fees from the corporation.

By the time the dissolution came before the trial court, however, many of the issues being litigated involved Collins and Blair personally. Blair filed suit on behalf of the corporation and himself. As Blair's actions benefitted not only the corporation but also benefitted him personally, the trial court's decision to allow Blair to use corporate funds to pay for all of his legal fees was error. On remand, an allocation should be made to determine which of Blair's fees were incurred in pursuit of corporate goals, which the corporation shall pay, and which were incurred in pursuit of personal goals, which Blair shall pay.

### E. The Superior Court Did Not Err in Awarding Blair Enhanced Attorney's Fees.

■ The superior court ordered Collins to pay attorney's fees totaling $37,704 to Blair under Civil Rule 82. Blair incurred $83,782 in fees. His award, therefore, totaled 45% of his incurred fees. Collins alleges that this award resulted in Collins paying 90% of Blair's actual fees. As Blair paid his fees with corporate funds, Collins argues that he (Collins) had already contributed $37,702 towards Blair's fees.[18]

In awarding Blair attorney's fees, the court stated that the award was based on "the complexity of the issues, law and facts of the case which the court has found to be one of the most complex it has seen." Further-

more, the court stated that Collins's "conduct in removing corporate assets without justification, violation of fiduciary duties, the failure to offer a credible explanation of his actions constituted unreasonable conduct within the criteria of Civil Rule 82(b)(3) justifying" an enhanced award.

As there was no money judgment awarded in this case, attorney's fees are governed by Rule 82(b)(2). A prevailing party is entitled to 30% of the party's fees when the case goes to trial. The trial court justified the higher percentage award of 45% after a consideration of the factors in Rule 82(b)(3), allowing for variance in a fee award. We have affirmed awards of up to 75% of attorney's fees.[19] As Blair was the prevailing party, the court's findings that the law and facts were complex and that Collins pursued unreasonable claims and defenses in the suit supports the conclusion that an award of 45% of Blair's fees was not an abuse of discretion. However, on remand, this award should only be applied to those fees personally incurred by Blair.

## V. CONCLUSION

Because the trial court's findings are not clearly erroneous, we AFFIRM its order of dissolution of the corporation. However, because the trial court erred in allowing Blair to use corporate funds to pay for personal legal expenses, we REMAND for an allocation of Blair's legal fees.

---

**18.** Collins argues that the funds used to pay Blair's fees would have otherwise been distributed to him in the assets available for distribution. Collins, therefore, would have been entitled to 45% of the funds used by Blair, or $37,702. The

court's additional award under Rule 82 results in Collins's share of Blair's fees totaling 90%.

**19.** *Stevens ex rel. Park View Corp. v. Richardson,* 755 P.2d 389, 396 (Alaska 1988).